DAVID A. ROSENBERG
Nevada Bar No. 10738
U.S. BANKRUPTCY TRUSTEE
5030 Paradise Rd., #B-215
Las Vegas, Nevada 89119
Telephone: (702) 405-7312
darosenberg@7trustee.net

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | Case No. BK-S-11-19760-BAM |
| | Chapter 7 |
| **ANGELA THERESA GLEICH,** | **TRUSTEE'S REPLY TO:** |
| | *Opposition To Trustee's Motion To Sell Assets Of The Estate Free And Clear Of Liens And Encumbrances And To Surcharge Proceeds Of Sale — Real Property [3240 Santolina Drive, Las Vegas, NV 89135]* |
| Debtor. | |
| | Date of Hearing:  May 16, 2013 |
| | Time of Hearing:  11:00 a.m. |

David A. Rosenberg, chapter 7 trustee ("Trustee")[1] for the bankruptcy estate ("Estate") of Angela Theresa Gleich ("Debtor"), hereby files this **Trustee's Reply To:** *The Bank Of New York Mellon's* ("Lender" or "Junior Lienholder") *Opposition to Trustee's Motion To Sell Assets Of The Estate Free And Clear Of Liens And Encumbrances And To Surcharge Proceeds Of Sale — Real Property [3240 Santolina Drive, Las Vegas, NV 89135].* In its opposition [Dkt. No. 36], the Lender raised the following arguments: (1) the Property cannot be sold pursuant to § 363(b) because the Sale is not in the best interests of the Lienholders, the Estate, and the Debtor; (2) the Trustee may not, in the face of the Lender's objection, sell the Property free and clear of the Lender's lien under § 363(f)(5); and (3) because the Lender objects, the Broker Commission and § 506(c) carve-out for Trustee's § 326(a) fees ("506(c) Carve-out" or "Trustee's 363 Compensation") should be denied, as these services do not provide the Lender with any benefit.[2]

---

[1] If not defined herein, all capitalized terms shall have the meaning attached to them in the Sale Motion.

[2] The Lender actually makes a few other arguments in its opposition, though these are so flawed, untrue, and intentionally misleading that they do not deserve individual attention. For example, the Lender complains that the Trustee is depriving it of the right to credit bid despite the fact that the Motion clearly gives it this right. *See* Motion, Dkt. No. 28 at ¶19. Likewise, the Lender claims that "foreclosure proceedings are imminent" when the Clark County Recorder website clearly shows that the Lender filed its Notice of Default on 5/5/2011. *See* opposition, Dkt. No. 36 at Page 7; *cf*: Clark County Recorder's Website (attached as Exhibit A). These are but two examples.

Here, the Trustee believes that the Lender's arguments and objections must fail because: (1) the Sale can be authorized under § 363(b), as there exists a strong business justification for the Trustee selling the Property; (2) under *Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25 (9th Cir. BAP 2008), the Sale free and clear of liens and encumbrances can be approved using the consent of the homeowners association ("Association" or "HOA" or "Senior Lienholder") pursuant to §§ 363(f)(2) and (f)(5); and (3) the Trustee's administration of this Property qualifies for a surcharge under § 506(c) as a reasonable and necessary cost and expense of preserving and disposing of the Property for the benefit of the Lender.  As such, the Court may authorize and approve this Sale.

## ARGUMENT

**A.    Trustee May Sell Property Of The Estate Pursuant To 11 U.S.C. § 363(b)**

Generally, the court will examine the trustee's "business justification" for the sale. *In re 240 North Brand Partners, Ltd.*, 200 B.R. 653, 659 (9th Cir. BAP 1996).  Often, the court will also supplement the "business justification" rule with a "best interest" test before authorizing a sale. *In re Equity Funding Corp. of America*, 492 F.2d 793, 794 (9th Cir. 1974)(where an asset's market value is likely to deteriorate substantially in the near future, a sale is in the estate's best interest).  Here, the Trustee can demonstrate a business justification for authorizing this Sale, as well as explain why it is in the best interests of (i.e. provides maximum benefits to) the HOA, Lender, Estate, and Debtor—all while furthering key policies underlying the Bankruptcy Code.

**1.    The Sale Benefits The Senior Lienholder**

The Sale provides maximum benefit to the Senior Lienholder by allowing the Association to meet its obligations and timely enforce covenants owed by each homeowner to the community.  Because the Association is charged with, whenever possible, preserving the value of the neighborhood, it cannot ignore the presence of vacant homes and those in foreclosure, which negatively impact local property values and price trends.[3]  From the HOA's perspective, this Sale provides it with quicker repayment of assessments and a stop to the draining, neighborhood deterioration inflicted by insolvent homeowners, absent lenders, and vacant homes.

---

[3] For a thorough discussion of the challenges facing homeowners associations in Nevada, *See* Casey Perkins, *Privatopia in Distress: The Impact of the Foreclosure Crisis on Homeowners' Associations*, 10 Nev. L. J. 561 (2010).

### 2. The Sale Benefits The Junior Lienholder

This Sale provides maximum benefit to the Junior Leinholder without jeopardizing the Lender's ability to realize the value of its secured claim. This Sale is designed to afford the Lender the same fundamental protections provided to it in a Nevada foreclosure sale.[4] Equally important, this Sale will free the Lender of the need to pay many of the fees and costs associated with a foreclosure sale, including after-foreclosure expenses like eviction, maintenance, security, rehabilitation, holding costs, remarketing, and reselling, which can be considerable even if a foreclosure is uncontested. The Lender will also avoid being in the chain of title and any liabilities associated with being an owner of record. In short, the Lender will either receive the collateral free and clear via credit bid or pocket a higher value from the Sale—providing it liquidity in less time, at a lower cost—than it could ever recover without the Trustee's efforts.[5]

### 3. The Sale Benefits The Unsecured Creditors

This Sale maximizes benefits to unsecured creditors because they are guaranteed to receive half (1/2) of the § 506(c) Carve-out requested by the Trustee for his services. As there is no positive equity in the Property, they would otherwise receive nothing from a foreclosure sale.[6]

### 4. The Sale Benefits The Debtor

The Sale free and clear provides maximum benefit to the Debtor for two reasons: (1) orderly surrender of the Property and (2) the fresh start envisioned under the Bankruptcy Code.

---

[4] First, it provides the Lender with a right to credit bid its interest in the property under § 363(k), similar to protections found outside of bankruptcy. *See* NRS §§ 107.030, Covenant 6; 107.080. Second, it provides for a distribution of proceeds like that dictated under foreclosure law, with all costs and expenses of this Sale, including the Broker Commission and § 506(c) Carve-out, allotted priority and paid ahead of the Lender. *See* NRS § 40.462(a). Third, the Trustee's distribution procedure (detailed in the Motion) insures that claims are investigated and ownership is transferred consistent with Nevada law. Fourth, this Sale has almost certainly fetched a higher price than a foreclosure sale. Taken together, these rights and procedures have allowed the Trustee to expose and sell the Property for maximum value more quickly and with less expense—while simultaneously providing the Lender with Nevada's legal and equitable protections—than would likely be realized through state law foreclosure.

[5] By definition, a secured creditor should do as well in bankruptcy as in foreclosure, and, under § 506(a) and the best interest test, it must receive at least the value of its collateral—which is generally a judicially determined foreclosure sale value net of liquidation costs. *See* Jonathan Hicks, *Foxes Guarding the Henhouse:'The Modern Best Interests of Creditors' Test in Chapter 11 Reorganizations*, 5 NEV. L.J. 820, 837-38 (2005).

[6] Recently, another Ninth Circuit bankruptcy court—relying on almost identical reasoning—approved a chapter 7 trustee's motion to sell property free and clear after finding that it was in the best interests of creditors and the estate:

> Without the sale, the evidence shows that [secured creditor] will seek relief from the stay to seek foreclosure against the [property]. [The Trustee] testified that he cannot stop [secured creditor], and so if the sale is not approved the estate will receive nothing and the [property] will be lost to the estate.

*In re Blixseth*, 2011 WL 1519914, *16 (Bankr. D. Mont. Apr. 20, 2011)(slip copy).

- 3 -

### *The Sale Brings Finality To The Disposition Of The Property*

First, this Sale brings a fair and orderly resolution to the turmoil associated with surrendering the Property, allowing the Debtor a means to extricate himself from this financial burden by taking responsibility for the transfer of ownership and possession of the Property. Filing for chapter 7 bankruptcy protection was a significant milestone for the Debtor—it signified his shift from the false panacea of mortgage modification to an acceptance of economic distress. Helping the Trustee secure, maintain, and sell his surrendered property to new owners now should bring the Debtor definitive closure while encouraging accountability in bankruptcy.

### *The Sale Allows For A Fresh Start*

Second, the Sale acknowledges that significant factors can—or already are—impacting the ability of the Debtor to get a fresh start today, even after he elected to surrender his home in bankruptcy. In Nevada, the Debtor remains on title until ownership is actually transferred—until then, he is responsible for everything that occurs on or to the Property, even if it is vacant.[7] This includes being liable for all unpaid, post-petition HOA fees. *See* § 523(a)(16); *Hamm v. Arrowcreek Homeowners' Ass'n*, 124 Nev. 290, 183 P.3d 895 (2008)(liability for dues remains as long as one remains on title). Similarly, any third party who suffers an injury reasonably connected to the Property may bring suit against the Debtor for post-petition damages if the Debtor remains on title after receiving his discharge. Also, the Lender's decision to delay foreclosure inflicts real harm on the Debtor by keeping his credit-worthiness trapped in subprime limbo, as he has no way to prevent a late foreclosure from undermining his credit report.[8]

By contrast, approving this Sale will minimize the Lender's continued harm to the Debtor, which is fueled by an absence of finality. It will also expedite the Debtor's fresh start, protect his expectations, and reinforce the injunctive integrity of a bankruptcy discharge order.

### 5. Public Policy Supports This Sale

This Sale speaks to the fundamental policy in bankruptcy law—the balance between

---

[7] Debtors do not realize that even if they indicate that they will surrender their homes in the bankruptcy, they are still technically "owners"—and, therefore, still under a legal duty to maintain the property until it is foreclosed.

[8] For example, a debtor won't be eligible for a Federal Housing Administration ("FHA") approved loan until two years after his discharge, provided three years have also passed since his last foreclosure. Thus, while a debtor with an efficient foreclosing lender will wait two to three years to get an FHA loan, a debtor whose lender unreasonably delays foreclosure for a year or longer must wait four or five years to qualify. This is true regardless of whether the debtor surrendered the property in his bankruptcy or when he vacated it. So long as the debtor remains on title, his discharge relief is ineffective; his ability to get a fresh start is hostage to the bank's decision not to foreclose timely.

providing debtors with a fresh start and limiting losses to creditors. *See Sherwood Partners, Inc. v. Lycos, Inc.*, 394 F.3d 1198, 1203 (9th Cir. 2005). While bankruptcy policy alone cannot force secured creditors to take responsibility for their collateral or act consistently with their contractual right to preserve it, it certainly can encourage ways to limit losses while not denying "good faith" debtors their fresh starts. Bankruptcy sales by the Trustee strike just this balance.[9]

### B.  This Sale Free And Clear Is Authorized Pursuant To § 363(f)(5)

The Ninth Circuit Bankruptcy Appellate Panel (hereafter "BAP" or "Panel") has clearly laid out the requirements for a sale of real property free and clear of liens and interests under § 363(f)(5). *See Clear Channel*, 391 B.R. at 30.

### *Clear Channel's Facts And Holding*

In *Clear Channel*, the Bankruptcy Appellate Panel noted that the wording of § 363(f)(5) imposes three requirements to sell free and clear: (i) a proceeding exists or could be brought; (ii) in which a nondebtor could be compelled to accept a money satisfaction; and (iii) of its interest." *Id*. at 41. Taking up these factors in reverse order, the Panel concluded that a lien constitutes an "interest" for purposes of § 363(f)(5). *Id*. at 42. With respect to the second factor, the Panel reasoned that a qualifying proceeding is one in which a lien or other interest "could be compelled to take less than the value of the claim secured by the interest." *Id*. at 45. Finally, the Panel held that the first factor of § 363(f)(5) "requires that there be, *or that there be the possibility of*, some proceeding, either at law or at equity, in which the nondebtor *could be forced* to accept money in satisfaction of its interest." *Id*. (emphasis added).

The Panel then rejected the trustee's argument that the availability of cramdown under § 1129(b)(2) satisfies the "legal or equitable proceeding" requirement of § 363(f)(5). *Id*. at 46. The BAP stated that it would be "circular reasoning" to sanction "the effect of cramdown without requiring any of section 1129(b)'s substantive and procedural protections." *Id.*; *cf. In re Terrace Chalet Apartments*, 159 B.R. 821 (N.D. Ill. 1993)(invoking chapter 11 cramdown). The Panel further suggested that no section of the Bankruptcy Code can satisfy § 363(f)(5) because "[i]f the proceeding authorizing the satisfaction was found elsewhere in the Bankruptcy Code, then an estate would not need § 363(f)(5) at all; it could simply use the other Code provision." *Id*.

Ultimately, the Panel reversed the bankruptcy court's decision because the bankruptcy court had failed to make the necessary findings. *Id*. at 47. The Panel then remanded the matter to

---

[9] The real value of the Trustee's services comes down to providing the secured creditors with a greater recovery.

- 5 -

allow the parties to identify a qualifying proceeding under non-bankruptcy law that would enable the trustee to sell the property free and clear of the junior lienholder's interest.[10] *Id*. However, on remand, the issue of applicable non-bankruptcy law was not pursued. [11] Thus, the issue of whether state foreclosure law could supply the mechanism or the applicable non-bankruptcy law to allow a sale free and clear was never raised or addressed in *Clear Channel*.[12]

### *Clear Channel Adopts The Narrow View Of § 363(f)(5)*

Section § 363(f)(5) presents a conundrum: how should § 363(f)(5) be interpreted by a bankruptcy court so as not to be either "all-powerful" or "so specialized as never to be invoked?" *Clear Channel*, 391 B.R. at 38. Under an "all powerful" reading, § 363(f)(5) always permits a sale simply by pointing to some theoretical possibility under which a money satisfaction could be compelled. Because this expansive interpretation makes one wonder why Congress bothered to place any prerequisites on sales free and clear, cases like *Clear Channel* have found ways in logic and the law to set limits and narrow this subsection's scope. *See*, *e.g.*, *In re Haskell, L.P.,* 321 B.R. 1, 9 (Bankr. D. Mass 2005)(holding mere existence of eminent domain powers insufficient to satisfy § 363(f)(5) absent showing that such mechanism could be exercised by trustee under facts of case); *Terrace Chalet,* 159 B.R. at 827, 829-830 (requiring the debtor to demonstrate that it could cramdown a secured creditor's lien under §1129(b)(2) before allowing a sale under § 363(f)(5) to proceed).

According to *Clear Channel*, an expansive reading is an overly broad construction that "renders the other subsections under § 363(f) mere surplusage." *Clear Channel*, 391 B.R. at 41.

---

[10] Though the BAP remanded the matter, it never waded into the issue of whether state foreclosure law could supply the mechanism or the applicable non-bankruptcy law to allow a sale free and clear. Largely, this resulted from a failure by the chapter 11 trustee and the bankruptcy court to raise it and point the BAP to California foreclosure law.

[11] Shortly after *Clear Channel* was published, the parties settled the case—and the BAP's decision was not vacated. Because of this settlement, any potentially clarifying points that could have been added by either court to mitigate confusion from the BAP's decision are left to academic speculation. *See* Request for Issuance of Notice of Transfer of Claim Pursuant to F.R.B.P. Rule 3001(e)(2), *In re Pw, LLC*, Case No. 06-16059, Dkt. No. 245 (Sept. 4, 2008).

[12] While the BAP does not identify foreclosure under state law as a mechanism that could compel junior lienholders to take less than their interests are worth, it certainly hints at it. Specifically, the Trustee finds it notable that *Clear Channel's* analysis of § 363(f)(5) relies heavily on a bankruptcy court decision, *In re Gulf States Steel,* 285 B.R. at 508-509, which looked to Alabama foreclosure law for authority to allow a sale free and clear under § 363(f)(5). "Ableco has a lien on the Property that is senior in priority to such claims, liens or interests. Thus, the holders thereof would be compelled as a matter of law to release the same in a judicial or non-judicial foreclosure of the senior liens held by Ableco. *See* Ala. Code § 35-10-5." *Id.* Considering *Clear Channel's* thoroughness, the Trustee finds it difficult to ignore the BAP's choice to keep mentioning *Gulf States Steel*—including citing to it for the cornerstone proposition that § 363(f)(5) requires the existence of a "mechanism" for extinguishing a lien (*Clear Channel*, 391 B.R. at 43)—without ever once questioning, not even in a footnote, that court's application of Alabama foreclosure law.

Applying this logic to the statute, the BAP first moved to adopt restricted constructions to prevent overlap unless a plain reading supported an expansive scope.[13] *Id.* at 40-43. Next, the Panel concluded that, while a plain reading of "interest" includes liens, § 363(f)(3)'s language would be too expansive if "aggregate value of all liens" merely referred to economic value under § 506(a); likewise, § 363(f)(5) would be too expansive if one could simply point to a hypothetical proceeding without also indicating how the result "could be compelled." *Id.* Ultimately, the Panel decided on a narrow interpretation of § 363(f)(5)—one less concerned with limiting hypothetical mechanisms than with requiring a higher burden of proof as to their availability. *Id.* at 43. The Panel laid out the case law supporting this narrow construction as follows:

> Under the view that full payment is not necessary, it is not the amount of the payment that is at issue, but whether a "mechanism exists to address extinguishing the lien or interest without paying such interest in full." *In re Gulf States Steel,* 285 B.R. at 508. Other courts have required a showing of the basis that could be used to compel acceptance of less than full monetary satisfaction. *See, e.g., id.; In re Terrace Chalet Apts.,* 159 B.R. at 829.

*Id.* Thus, to be in compliance with *Clear Channel*, a trustee must demonstrate two things:

(1) A mechanism that is capable of hypothetically extinguishing each lien without full payment; and

(2) How the trustee himself could use (either directly or indirectly) that identified mechanism to compel the corresponding lienholder to accept less than full payment.

While *Clear Channel* does not reduce the rules from *Gulf States Steel* and *Terrace Chalet* into the simple two-step test presented above, any mathematically unchallenged reader can derive this result from *Clear Channel's* three-part equation: "(1) a proceeding exists or could be brought, in which (2) the nondebtor could be compelled to accept a money satisfaction of (3) its interest."[14] *Id.* at 41. Additionally, any reader looking closely at the examples chosen by the Panel can observe how they illustrate *Clear Channel's* dual criteria approach: a partnership buy-out arrangement, a liquidated damages clause, a damage remedy in a real estate conveyance—each provides an identifiable mechanism capable of reducing an interest to a claim and each allows parties who have contracted for said mechanism to *actually* use it to compel. *Id*. at 43-44.

---

[13] *See Clear Channel*, 391 B.R. at 40 ("This reading expands § 363(f)(3) too far."); *Id.* ("But another reason…exists to reject such an expansive reading."); *Id*. at 41 ("We believe that Congress intended "interest" to have an expansive scope."); *Id*. at 43 ("[363(f)(5)'s] scope need not be expansive…).

[14] Since the third variable is satisfied whenever § 363(f)(5) is applied to a lien, only two elements remain in the test.

- 7 -

Unfortunately, the eloquence of the BAP's "narrow" formulation of § 363(f)(5) has been lost on many readers, who mischaracterize these examples to suggest that the BAP intended the universe of qualifying proceedings under § 363(f)(5) to be quite small. Moreover, this widespread assertion that *Clear Channel* was trying to effectively write § 363(f)(5) out of the Code has forced courts in the Ninth Circuit to make "clarifications" of *Clear Channel* to prevent others from adopting this incorrect reading. *See In re Jolan, Inc.*, 403 B.R. 866 (Bankr. W.D. Wash. 2009); *In re East Airport Development LLC*, 443 B.R. 823, 830-831 (9th Cir. BAP 2011).

### *"Clarifying" Clear Channel's Two-Step Test For Lien Interests*

Picking up where *Clear Channel* left off, the *Jolan* court set out to discuss what types of proceedings could permit a sale under § 363(f)(5) when the sales price is insufficient to satisfy all of the liens. *See Jolan*, 403 B.R. at 866. In *Jolan*, a chapter 7 trustee sought authority to sell the debtor's personal property to the debtor's previous landlord for $25,000. *Id*. at 867. Objections were filed arguing that, under *Clear Channel*, a sale free and clear of liens under § 363(f)(5) could not be authorized over objections by secured parties who would not be paid full value for their claims.[15] *Id*. The *Jolan* court addressed this widespread misconception head-on, noting that the appellees in *Clear Channel* had not argued that any qualifying "legal or equitable proceedings" existed beyond cramdown under § 1129; hence, the BAP had exercised its prerogative to limit its ruling to arguments presented by the parties. *Id*. at 869. As such, the Panel in *Clear Channel* never considered whether there may be other state law "non-contractual mechanisms whereby a lienholder might get less than full payment yet lose the lien." *Id*.

The *Jolan* court then held that the property at issue could be sold at auction free and clear of liens pursuant to § 363(f)(5) because various Washington State and non-Bankruptcy Code statutes provide mechanisms for the release of creditors' liens for less than their full value. *Id*. at 869-870. These mechanisms included: (1) a senior secured party's disposition of collateral under the default remedies provided in Article 9 of Washington's Uniform Commercial Code; (2) a receiver's sale of assets free and clear of liens with the liens attaching to the sale proceeds; (3) the liquidation of a probate estate; (4) a personal or real property tax sale; (5) a federal tax lien sale; and (6) the disposition of real property through "judicial and nonjudicial foreclosures, which operate to clear junior lienholders' interests, with their liens attaching to proceeds in excess of the costs of sale and the obligation or judgment foreclosed." *Id*.

---

[15] These objectors appear to have accepted that liens are interests, satisfying the third prong of *Clear Channel's* test.

- 8 -

While the *Jolan* court certainly went to great lengths to list hypothetical proceedings under non-bankruptcy law, it never stated that a party seeking to sell assets pursuant to § 363(f)(5) must simply show the existence of some mechanism by which, under any set of facts, a secured creditor may be compelled to accept payment in return for its interest in the property.[16] Instead, a close reading of *Jolan* shows agreement with *Clear Channel* that it is the moving party's burden (in both cases, the trustee) to present evidence that, under his facts, there exists a mechanism that can be used to extinguish the lienholder's interest in the subject property.[17] Indeed, the *Jolan* court only granted the trustee authority to sell free and clear after the senior lienholder consented to releasing its lien in the collateral.[18] *Jolan* therefore accepts a classic premise underlying cases like *Clear Channel and Gulf States Steel*—that where property is encumbered by multiple liens, the trustee generally cannot sell free and clear absent consent from the most senior lien, since presumably no non-bankruptcy legal or equitable proceeding exists whereby the senior lien could be compelled to accept a money satisfaction of its claim for less than the claim's full amount.

Fundamentally, then, *Jolan* stands for the following limited proposition: in circumstances where (a) the senior lienholder consents to the sale and (b) the junior lienholders are undersecured, the trustee can sell the property free and clear of junior liens, as these junior lienholders could be compelled to accept a money satisfaction in a state foreclosure action commenced by the senior lienholder.[19] Beyond that, *Jolan* simply expounds on the first part of *Clear Channel's* test before finally adopting its view that the mere existence of any mechanism is insufficient to satisfy §

---

[16] Rather, *Jolan* presents a litany of alternatives to demonstrate that there exist many instances where a sale free and clear under §363(f)(5) would not unduly prejudice objecting junior lienholders. *Jolan's* intent in doing so is merely to clarify that "narrow" was not meant to limit available proceedings only to those examples given in *Clear Channel.*

[17] "*And were the trustee proposing to sell real property*, judicial and nonjudicial foreclosures in Washington operate to clear junior lienholders' interests, and their liens attach to proceeds in excess of the costs of sale and the obligation or judgment foreclosed." *Jolan*, 403 B.R. at 870 (emphasis added to show trustee restricted by his facts).

[18] Originally, the trustee did not specify which subsection of § 363(f) applied but noted that "there is a dispute among the secured creditors as to who has the higher priority." *See* Trustee's Motion For Sale of Property under Section 363(b), *In re Jolan Inc.*, Case No. 09-10411, Dkt. No. 40 at 2 (Bankr. W.D. Wash. Mar. 17, 2009). At some point, the trustee settled this dispute and found the senior lienholder was Evergreen Bank. Evergreen Bank then filed an opposition, stating: "[It] does not object to a sale of the debtor's interest in the collateral so long as it is clear that Evergreen does not consent to a stripping of its lien position in the collateral." *See* Supplemental Memorandum re proposed sale of collateral, *Id.*, Dkt. No. 55 at 2 (Bankr. W.D. Wash. Apr. 9, 2009). In other words, Evergreen consented to a sale of its collateral so long as it would hold a first position security interest in the proceeds after sale.

[19] Other courts in the Ninth Circuit have similarly accepted this limited proposition as being consistent with *Clear Channel*. *See, e.g.,* Order, *In re Black Bull Run Development, LLC.*, No. 10-60593, Dkt. No. 247, *9 (Bankr. D. Mont. Jan. 20, 2011)(finding that *Clear Channel* does not preclude approval of a sale by the trustee under § 363(f)(5) where the senior lienholder has consented under § 363(f)(2) and the estate stands to receive some benefit for helping the senior lienholder "move forward without having to go through State court foreclosure proceedings").

363(f)(5) absent a showing that, under the facts of the case, that mechanism *could actually be used* by the trustee to extinguish the lienholder's interest.[20] Thus, like *Clear Channel*, *Jolan* is about raising the evidentiary bar required for the trustee to commence a sale under § 363(f)(5).

### ***Courts Adopting The Expansive View Misread Jolan To Attack Clear Channel***

Sadly, while *Jolan's* clarification may lead some courts back to the three part analysis required by *Clear Channel*, other courts still continue to misconstrue *Jolan's* holding and apply it as negative precedent contrary to *Clear Channel*. *See, e.g., In re Boston Generating, LLC,* 440 B.R. 302, 333 (Bankr. S.D. N.Y. 2010). In *Boston Generating*, the senior lienholder took the position that its consent to a sale under § 363(f)(2), although given, was not required, as this sale could be approved without such consent pursuant to § 363(f)(5). *Id.* at 318. The junior lienholder, meanwhile, refused to consent and objected, contending that *Clear Channel* required the senior lienholder to demonstrate how a sale without the junior lienholder's consent could be compelled under the terms of the intercreditor agreement. *Id.* at 332-333. The court ultimately approved the sale under § 363(f)(5), reaching the correct result despite its own flawed reasoning:

> This Court declines to follow *Clear Channel.* Section 363(f)(5) does not require that the sale price for the property exceed the value of the interests. As recognized in a post-*Clear Channel* decision from a Bankruptcy Court in the Ninth Circuit, the existence of judicial and nonjudicial foreclosure and enforcement actions under state law can satisfy section 363(f)(5). *See In re Jolan, Inc.,* 403 B.R. 866, 870 (Bankr.W.D.Wash.2009). Numerous legal and equitable procedures exist by which the Second Lien Lenders could be forced to accept less than full payment of the Second Lien Debt. Thus, the Court finds that because the Second Lien Lenders could be compelled under state law to accept general unsecured claims to the extent the sale proceeds are not sufficient to pay their claims in full, section 363(f)(5) is satisfied.

*Id.*

In declining to follow *Clear Channel*, the *Boston Generating* court adopted broad reasoning which made § 363(f)(5) superfluous. It did this by misstating *Clear Channel's* holding and incorrectly reading *Jolan* to say that the mere existence of a proceeding—without the court delving into whether the debtor could actually use that mechanism to compel the junior lienholder to accept a money satisfaction of its interest—was enough. Had it read *Jolan* closer, the *Boston Generating* court could have applied *Jolan's* limited proposition to reach the same result, finding that the debtor there had met its burden under § 363(f)(5) when the senior lienholder—who had

---

[20] *See, e.g.*, Memorandum Opinion, *In re Pioneer Village Investments, LLC*., 2010 WL 4941677, * 2 (Bankr. D. Or. Dec. 3, 2010)(finding §363(f)(5) not satisfied where sale motion cites to *Jolan* as authority but fails to point to any proceeding under Oregon law that would permit a court to compel the lender to suffer a sale of its collateral).

- 10 -

the power to foreclose—consented to the debtor's use of its remedy in a bankruptcy sale. Thus, not only was this sale approvable under *Clear Channel*, there was no reason to ever hold otherwise.

Nevertheless, courts which look to *Jolan*'s framework to approve sales still continue to dismiss *Clear Channel* by describing themselves as leaning more toward an expansive view of § 363(f)(5).[21] On the surface, it would appear that these courts simply treat § 363(f)(5) as a one-part test easily satisfied whenever the trustee can point to a mechanism. Dig deeper, though, and, more often than not, what these courts are really doing is misusing *Jolan* as a time-saving tool—one that lets them approve a desired sale without asking tough questions or doing heavy lifting.

### *The First Prong Of Clear Channel's Test Is Satisfied Here*

In various proceedings under Nevada and non-bankruptcy law, there exist hypothetical mechanisms by which secured creditors could have their liens extinguished. These include many of the same proceedings cited in *Jolan*: receivership sales, real property tax sales, liquidations under probate, and federal tax lien sales.[22] Additionally, foreclosure (judicial and nonjudicial) is the most prevalent mechanism for selling secured property in Nevada.[23] Still, while each of these mechanisms could theoretically satisfy the first prong of the test under *Clear Channel*, the Trustee here relies on the fact that Nevada law provides homeowners associations with a super priority lien. *See* NRS §§ 116.3116. Associations in Nevada can use this senior lien to foreclose ahead of, and without the consent of, even consensual first mortgages like the Lender.[24]

### *The Second Prong Of Clear Channel's Test Is Satisfied Here*

A homeowners association has a perpetual lien against the properties in its community. NRS § 116.3116(4)("Recording of the declaration constitutes record notice and perfection of the lien. No further recordation of any claim of lien for assessment under this section is required.").

---

[21] *See, e.g.*, Memorandum Regarding Sale, *In re Wrangell Seafoods, Inc.*, 2009 WL 8478297, *1 (Bankr. D. Alaska Mar. 9, 2009)(finding sale could be made free and clear of objecting junior lienholders because state law allows their security interests to be eliminated in a foreclosure sale)("The BAP in *Clear Channel* takes a very narrow view of what can occur upon sales made pursuant to 11 U.S.C. § 363(f). I respect the scholarship and reasoning displayed in the opinion. However, I disagree with the BAP's conclusion. I tend to take a more liberal view of the statute. Alaska law permits the sale of real and personal property interests by foreclosure. Under state law, secondary security interests can be eliminated at foreclosure sales. The sale is justified under § 363(f)(1) and (5).").

[22] *See* NRS §§ 78.700, 361.585, 361.595, 361.610, 148.130, and 148.140 and 26 U.S.C. §§ 6335, 6339(c), and 6342.

[23] *See* NRS §§ 40.430 (judicial foreclosure) and 107.080 (nonjudicial foreclosure).

[24] In addition to foreclosing on its super priority lien, an HOA can also use abatement liens to enforce maintenance and appearance requirements. *See* N.R.S. 116.310312. Abatement liens are senior to a first mortgage and to all other encumbrances on the property except taxes and governmental assessments or charges. *Id.*

- 11 -

NRS § 116.3116(1) provides for any penalties, fees, charges, fines, and interest to be enforced as assessments, with the full amount of these assessments granted a lien against the property. The super priority portion of this lien primes the first mortgage on the property to the extent that those assessments would have become due in the nine months prior to enforcement of the lien. NRS § 116.3116(2). As such, this super priority lien allows an association to either wait for the first mortgage to foreclose or else, by itself or through its agent or attorney, foreclose on its super priority lien. *See* NRS § 116.31164(1); *The Super Priority Lien*, NV Real Estate Div. Advisory Op. 13-01, pp. 8-9 (Dec. 12, 2012)[25] (**"An association can foreclose its super priority lien[,] and the first security interest holder will either pay the super priority lien or lose its security"**)(attached as Exhibit B); *see also Wingbrook Capital, LLC v. Peppertree Homeowners Assoc.,* Case No A-11-636948-B, June 2, 2011 Order (Dist. Ct. Clark County, NV. June 2, 2011), at p. 3, ¶¶ 2-3 (**"Homeowners' associations . . . have a Super Priority Lien which has priority over the First Security Interest on a homeowners' unit."**) and *In re Gonzalez*, Case No. BK-S-11-12044-lbr, Dkt. No. 44, unpublished order, at p. 4, ¶¶ 9-14 (Bankr. D. Nev. Dec. 13, 2012) (**"Pursuant to NRS 116.3116(2), any security interest in the Property held by [a bank with a first security interest] is junior to the HOA's super-priority lien."**)(Order and Hearing Transcripts attached as Exhibit C).

Here, the Association has a perfected super priority lien against the Property, and it has expressly consented to this Sale by the Trustee. *See* HOA Stipulation, attached to Motion as Exhibit 4 ("[T]he Association agrees to, and hopes to proceed immediately to conduct, a sale of the Property in bankruptcy via the Trustee's Motion"). As such, the Association can now consent to have the Trustee foreclose its senior lien in bankruptcy court rather than foreclose its lien under state law or wait for the Lender to foreclose. The Trustee offers it this convenience in exchange for compensation that he will share with the Estate.[26] Put another way, the HOA has

---

[25] In August of 2012, the Nevada Supreme Court recognized that the Nevada Real Estate Division of the Department of Business and Industry is responsible for interpreting NRS 116 and issuing advisory opinions relating to the extent and priority of the HOA super priority lien. *See State, Bus. & Indus. v. Nev. Ass'n Servs.*, 128 Nev. Adv. Op. 34, 2012 WL 3127275 at 4 (Nev. Aug. 2, 2012)("We therefore determine that the plain language of the statutes requires that the CCICCH and the Real Estate Division, and no other commission or division, interpret NRS Chapter 116.").

[26] Interestingly, a collection agency instructed by an HOA to foreclose will bill the HOA for fees, services, and other costs associated with foreclosure; the HOA will be reimbursed later by adding those charges onto its lien. As such, the § 506(c) Carve-out for Trustee's 363 Commission is also justified by reference to this same statutory provision allowing for payment of fees and charges to anyone who provides foreclosure services. *See* NRS 116.31164(3)(c).

decided to exercise its foreclosure remedy—the mechanism granted to it by state law to compel junior liens to accept satisfaction of their interests—via a consent stipulation with the Trustee.

Here, the HOA's consent under § 363(f)(2) is fundamentally no different from any other case—including *Clear Channel* and *Jolan*—where a senior lienholder agrees to allow a § 363(f) sale of its collateral by a trustee. It is also nearly identical, by analogy, to the position a trustee finds himself in after he avoids a senior lien and preserves it for the benefit of the estate; the trustee may now sell the property. *See, e.g., In re Ellis*, 2011 WL 61378, *3 (Bankr. D. Idaho Jan. 7, 2011)("Trustee avoided the lender's lien, and that lien has been preserved for the estate…Standing in the shoes of Suntrust, Trustee can consent to a sale even if the amount received will not pay off the obligation secured by the deed of trust."). Standing in the HOA's shoes via consent, the Trustee now has the ability to actually use NRS §§ 116.3116 to force this free and clear Sale. The Trustee therefore meets his burden under § 363(f)(5) by presenting this Court with more than just the existence of some hypothetical proceeding (HOA foreclosure) that could theoretically extinguish the Junior Lienholder's interest; the Trustee has also demonstrated how the Senior Lienholder's consent actually allows him to use said mechanism to compel.

### *The Third Prong Of Clear Channel's Test Is Satisfied Here*

All secured creditors' liens are interests which can be satisfied through payment of claims.

### *The Trustee Has Satisfied All Three Prongs Of Clear Channel's Test*

The Trustee has satisfied the increased evidentiary burden under *Clear Channel's* "narrow" interpretation of § 363(f)(5) and is authorized to carry out this Sale under that section.

**C.     The Court Should Approve The § 506(c) Carve-out And Broker Commission**

Subject to limitations imposed upon compensation set forth in the Bankruptcy Code and Bankruptcy Rules, including 11 U.S.C. §§ 326, 330, and 331, the Trustee will be compensated his reasonable fees, as approved by the Court, in connection with conducting a Sale of the Property. Compensation awarded to a trustee under § 330(a) must be in the form of a commission (*i.e.,* a percentage of monies disbursed by the trustee to parties in interest) calculated in accordance with § 326. Sec. 330(a)(7); *In re Salgado–Nava,* 473 B.R. 911, 921 (9th Cir. BAP 2012)("absent extraordinary circumstances, chapter 7, 12 and 13 trustee fees should be presumed reasonable if they are requested at the statutory rate."). Accordingly, Trustee's § 363 Compensation should equal the statutory fee computed under § 326 at the full Purchase Price.

While § 326 is a logical starting point, *see In re McKinney,* 383 B.R. 490, 496 (Bankr. N.D. Cal. 2008), a trustee may also seek to have his services and expenses reimbursed as a surcharge. *See* § 506(c); *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000). This is because courts have long recognized that expenses of sale and of preparation for sale are recoverable by a trustee. *See In re Marino*, 794 F.2d 1367, 1370 (9th Cir. 1986); *In re Anderson*, 66 B.R. 97, 99 (9th Cir. BAP 1986)("We read the Code to provide for payment of the trustee's direct costs of sale out of the proceeds of the sale before distribution to the secured creditors."). Under § 506(c), the trustee seeking recovery must establish that the expenses he incurred were (1) reasonable, (2) necessary, and (3) provided a benefit to the secured creditor. *In re Compton Impressions Ltd.*, 217 F.3d 1256, 1262 (9th Cir. 2000); *In re Cascade Hydraulics & Utility Svc., Inc.*, 815 F.2d 546, 548 (9th Cir. 1987). The trustee must also show a "concrete" and "quantifiable" benefit. *In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d 1061, 1068 (9th Cir. 2001). Once these burdens are met, § 506(c) authorizes payment of these surcharge proceeds directly to the trustee who provided quantifiable benefits to the secured collateral. *Id*.

Here, in addition to Trustee's § 363 Compensation being collectable under NRS §§ 116.31164(3)(c)[27], *see also supra*, n. 25, the administration of this Property also qualifies under § 506(c) as a reasonable and necessary cost and expense of preserving and disposing of the Property for the benefit of the Lender. The Trustee further submits that a § 506(c) surcharge is more appropriate under these facts than seeking payment under § 330(a), as the § 506(c) Carve-out is more like a claim by the Trustee for providing personal services that directly benefitted the Lender (akin to a trustee being paid for conducting a nonjudicial foreclosure sale) than an

---

[27] "NRS 116.31164(3)(c) allows the proceeds of the foreclosure sale to be distributed in the following order:

(1) The reasonable expenses of sale;
(2) The reasonable expenses of securing possession before sale, holding, maintaining, and preparing the unit for sale, including payment of taxes and other governmental charges, premiums on hazard and liability insurance, and, to the extent provided for by the declaration, reasonable attorney's fees and other legal expenses incurred by the association;
(3) Satisfaction of the association's lien;
(4) Satisfaction in the order of priority of any subordinate claim of record; and
(5) Remittance of any excess to the unit's owner.

Subsections (1) and (2) allow the association to receive its expenses to enforce its lien through foreclosure *before* the association's lien is satisfied." *The Super Priority Lien*, NV Real Estate Div. Advisory Op. 13-01 at 7-8 (emphasis in original).

administrative fee charged against the unsecured creditors' recovery.[28]  The Trustee therefore requests a § 506(c) Carve-out which equals his statutory maximum commission under § 326(a) for a Sale at the Purchase Price.[29]  This surcharge will be paid directly to the Trustee for services performed, and he will promptly make a gift of half (1/2) of the § 506(c) Carve-out to the Estate, to be disbursed to unsecured creditors.[30]  This carve-out from the Trustee's reimbursement for his services provides for a meaningful distribution.[31]  Similarly, the Broker Commission is reasonable, necessary, and beneficial, and its payment should be approved by the Court as well. [32]

## CONCLUSION

Having demonstrated that this Sale is proper under the Bankruptcy Code, is in the best interests of all parties in interest, is designed to provide a meaningful benefit to the Estate, and will further important public policy goals, the Trustee now asks this Court to approve the Sale.

DATED this 27th day of March, 2013.          **U.S. BANKRUPTCY TRUSTEE**

By:  */s/ David A. Rosenberg*
David A. Rosenberg, Trustee

---

[28] While the Trustee labels this a § 506(c) Carve-out, that is a misnomer.  Generally, a carve-out is a consensual payment to unsecured creditors while § 506(c) is a provision which forces secured creditors to repay administrative expense incurred preserving or disposing of collateral.  Here, the Trustee relies on §§ 326(a) and 506(c), combined with allowable gifting practices, to justify this "involuntary" carve-out.  Doing so is entirely consistent with *Hartford Underwriters*, which shows how Congress only provides the ability to recoup these expenses to the trustee.

[29] The Ninth Circuit has not yet addressed whether a trustee's statutory compensation may be recovered under § 506(c).  *See In re Choo*, 273 B.R. 608, 613 (9th Cir. BAP 2002)(declining to address whether the value of the trustee's labor can be reimbursed under § 506(c) where the trustee's actions benefited the secured creditor).  However, it has held that **§** 506(c) authorizes the party that provided the benefit to the secured creditor to *directly* recover for its work from the secured collateral. *See In re Debbie Reynolds Hotel & Casino, Inc.,* 255 B.R. at 1067-1068 (where the basis for the surcharge was the work of the debtor's attorneys, counsel had the right to be reimbursed directly from the proceeds).  Thus, *Debbie Reynolds* suggests the trustee's commission can be recovered.

[30] The concept of gifting a part of one's distribution priority has been upheld in the chapter 7 context; this is primarily because the absolute priority rule has no application in a chapter 7 case.  *See In re SPM Mfg. Corp.*, 984 F.2d 1305 (1st Cir. 1993); *cf. In re DBSD North America, Inc.*, 634 F.3d 79 (2nd Cir. 2011)(abrogating certain gifting practices as violations of the absolute priority rule in the context of a chapter 11 plan).  *SPM Mfg.* is also consistent with the Ninth Circuit's conclusion that § 506(c) recoveries do not belong to the estate and do not fall within the priority scheme of the Bankruptcy Code. *In re Debbie Reynolds Hotel & Casino, Inc.,* 255 at 1067-1068.

[31] This compensation structure—using § 326 as a starting point, with 50% guaranteed to unsecured creditors—is modeled after one being used by trustees in Washington state (the same Ninth Circuit district that authored *Jolan*).

[32] "The Bank contends that no benefit was conferred on it by the sale of the property. The Bank was prepared to foreclose in state court at the time of the filing of the petition. However, the Bank's ability to pursue a state foreclosure sale does not mean that [the realtor's] actions conferred no benefit on the Bank." *In re Anderson,* 66 B.R. 97, 99 (9th Cir. BAP 1986)(cited by *In re Debbie Reynolds Hotel & Casino, Inc.,* 255 F.3d 1061, 1069 (9th Cir. 2001)).